UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

INDIANA PETROLEUM MARKETERS   )
AND CONVENIENCE STORE   )
ASSOCIATION,   )
THORNTON'S INC.,   )
RICKER OIL COMPANY, INC.,   )
FREEDOM OIL, LLC, and   )
STEVE E. NOE,   )
   )
                    Plaintiffs,   )
   )     No. 1:13-cv-00784-RLY-DML
               vs.   )
   )
ALEX  HUSKEY, in his official capacity   )
as Chairman of the Indiana Alcohol and   )
Tobacco Commission,   )
   )
              Defendant.   )

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Plaintiff, the Indiana Petroleum Marketers and Convenience Store Association

("IPCA"); three of its members, Thorton's Inc., Ricker Oil Company, Inc. and Freedom

Oil, LLC.; and an individual consumer, Steve E. Noe, challenge the constitutionality of

the Indiana Code § 7.1-5-10-11, which prohibits the sale of cold beer by the holder of a

beer dealer permit.  An evidentiary hearing on the Plaintiffs' Motion for Preliminary

Injunction was held on February 20-21, 2014.  The witnesses included: Robin Lynn

Poindexter, retired Major with the Indiana State Police; Matt Thornton, President and

CEO of Thorton's, Inc.; Gregory J. Cobb, managing member of Freedom Oil, LLC.;

Quinn B. Ricker, President and CEO of Ricker Oil Company, Inc.; Matthew Dublis, Vice

President of Operations at Thornton's; Karen Mitchener, Director of Human Resources at Ricker Oil; Steve Noe, a consumer; Travis R. Thickstun, Corporal of the Indiana State Excise Police; and Scot Imus, Executive Director of the IPCA.[1]  Plaintiffs request the court to declare that Indiana's alcohol beverage law is unconstitutional under both the United States and Indiana Constitutions, and to enjoin its enforcement.  Defendant, Alex Huskey, in his official capacity as Chairman of the Indiana Alcohol and Tobacco Commission ("ATC") or (the "State"), also moves for summary judgment.  The briefs in support of both motions rely on the same facts and law; accordingly, the court will address the motion for summary judgment first.

## I.  FINDINGS OF FACT

### A.    The Parties

1.  Plaintiff, IPCA, is an Indiana trade association, and its members are convenience stores that are located in Indiana. (Imus Test. at 420, 422).

2.  IPCA's function is to provide advice to, and advocate on behalf of, its Indiana convenience stores.  (*Id*. at 420, 424).

3.  IPCA's current members are 115 convenience store entities.  Those entities own and operate some 1,500 convenience stores in Indiana, and about 70% to 80% of those locations sell beer.  (*Id*. at 412-14).

---

[1] The testimony from the hearing will be cited as "[last name] Test. at [page number]." (*See* Filing No. 142, Filing No. 143). Testimony taken by deposition will be cited as "[last name] Dep. at [page number]"; testimony taken by declaration will be cited as "[last name] Decl. [paragraph number]"; and evidence submitted at the preliminary injunction hearing will be cited as "[Defendant's or Plaintiffs'] PI Ex. [designated by alphabet or number]."

4. Plaintiff, Thornton's Inc., a Delaware corporation, began in the convenience store Industry in the 1980s. (Thorton Test. at 139-141, 151-52). Thornton's currently owns and operates 175 convenience stores in six states, 26 of which are in Indiana. (Dabulis Test. at 250). Of its 26 Indiana convenience store locations, Thornton's sells beer at 18 of them. (*Id*. at 250-51). Thornton's has been cited once for violating Indiana Code § 7.1-5-10-11. (Plaintiff's PI Ex. C).

5. Plaintiff, Ricker Oil Company, Inc., is an Indiana corporation and 100% of its stock is owned by long-time Indiana residents. (Ricker Dep. at 35).

6. Ricker began in the Indiana convenience store business in 1991/1992. (Ricker Test. at 220). Ricker currently owns 50 stores in Indiana, 46 of which sell beer. (Ricker Dep. at 211).

7. Ricker has never been cited for violating Indiana Code § 7.1-5-10-11. (Ricker Test. at 225).

8. Freedom Oil, LLC, is an Indiana limited liability company and 100% of its units are owned by long-time Indiana residents. (Cobb Test. at 192-93).

9. Freedom started in 2002, and currently owns 6 stores in Indiana, three of which sell beer. (Cobb Test. at 184).

10. Freedom has never been cited for violating Indiana Code § 7.1-5-10-1. (*Id*. at 195-96).

11. Plaintiff, Steve E. Noe, 49, is an individual who resides in Richmond, Indiana, near the Ohio border. (Noe Test. at 270).

12. Noe occasionally buys beer, and prefers to buy cold beer. To buy cold beer, he must either purchase it at an Indiana liquor store or drive to New Paris, Ohio. (*Id*. at 271-74).

13. Defendant, Alex Huskey, is the Chairman of the Alcohol and Tobacco Commission, and is sued in his official capacity.

**B.      Indiana Code § 7.1-5-10-11**

14. The statutory provision at issue, Indiana Code § 7.1-5-10-11, provides:

    "Sale of Cold Beer Prohibited. It is unlawful for the holder of a **beer dealer's permit** to offer or display for sale, or sell, barter, exchange or give away a bottle, can, container, or package of beer that was iced or cooled[2] by the permittee before or at the time of the sale, exchange or gift."

    Ind. Code § 7.1-5-10-11 (emphasis added).

15. This provision applies to grocery stores and drug stores. (Thickstun Test. at 327; Poindexter Test. at 136). The parties agree that the statutory definition of "grocery store" includes a "convenience store." Ind. Code § 7.1-1-3-18.5.

16. Violation of this provision may result in a civil fine, or the suspension or revocation of the permittee's permit. *See* Ind. Code § 7.1-3-23-2; (Poindexter Test. at 88-89, 101).

17. There have been very few citations issued for violating this provision since the excise police began mandatory reporting in 2007. For example:

    In 2007, Thornton's placed various malt beverages in a cooler and was offering these for sale. Thornton's store manager was contacted by phone and stated that they mistakenly believed that these products could be sold cold as they believed

_____

[2] Plaintiffs do not challenge the "iced" provision of the statute; only the "cooled" provision.

them to be wine. Notably, the items in the cooler were not Bud Light, Coors, Corona, or other beers. Thornton's General Counsel assured the State that "this mistake will not happen again." The judgment was deferred for a year.

In 2008 Mt. Etna Bait was selling cold beer and, in fact, the store representative confirmed that the business was selling cold beer. The store unplugged the cooler that was cooling the beer and took down the signs that were advertising cold beer.

In 2009, Speedway had attached beer to their cooler areas as a way of making the beer cold. During the citation process, the manager told the officer that "he thought that by attaching beers to their cooler doors that they would get cold." Speedway was fined $150.00.

In 2010, Geist Market was advertising cold beer and the officer asked for a cold 12-pack of Coors Light and the employee retrieved the cold 12-pack of Coors Light from a walk-in cooler area. The officers searched the walk-in cooler area and discovered various brands of beer being stored there and all of the beer was very cold. There was also a stand-alone glass front cooler in the back room that was full of beer and the beer was very cold. There were 600 units of cold beer; however, the total fine was $250.00.

In 2010, Pappy's was cooling and selling malt beverages other than beer. The store believed that these products were wine and, thus, could be cooled. Beer was not being cooled. The judgment was deferred.

In 2011, JK Deli was cooling and selling malt beverages other than beer. The store believed that these products were wine and, thus, could be cooled. Beer was not being cooled. JK Deli was fined $150.00.

(Thickstun Decl. ¶ 4. *See also* Thickstun Test. at 165, 358-62; Defendant's PI Exs. C, E, G).

18. An entity that wishes to sell beer in the State of Indiana must apply for a permit. The court's Findings of Fact address three permits at issue in this case: (1) the beer dealer permit (for convenience stores, grocery stores, and drug stores); (2) the dealer permit (for package liquor stores); and (3) the beer retailer permit (for restaurants, taverns, and the like).

## C.     Beer Dealer Permits/Beer Dealers

19. The business model of a convenience store is premised on convenience, and this convenience is achieved in several ways: (a) being open 24 hours a day 365 days a year; (b) having no age restriction on customers; (c) providing a variety of goods including many basic necessities; and (d) having products available for customers to pick up and take to the cash register.  (*See generally*, Thickstun Test. at 151, 153-56, 160; Dabulis Test. at 254; Imus Test. at 416, 434-35; Ricker Test. at 225-26, 228-30, 232-33).

20. Convenience stores like Thornton's, Ricker, Freedom Oil, Speedway, Circle K; grocery stores like Marsh, Kroger, Meijer; drug stores like CVS and Walgreens; big-box stores like Walmart, Target, K-Mart, may sell beer (and if they contain a pharmacy, hard liquor) if they acquire the proper beer dealer permit, noted below. (Thickstun Test. at 326-27).

21. The types of permits that a convenience store (classified as grocery stores for permitting purposes) may acquire include: (a) a permit to sell beer only at a grocery store located in an incorporated area; (b) a permit to sell beer only at a grocery store located in an unincorporated area; (c) a permit to sell beer and wine at a grocery store located in an incorporated area; or (d) a permit to sell beer and wine at a grocery store located in an unincorporated area.  (Thickstun Decl. ¶ 5).

22. These permits are issued with the following conditions: (a) all beer and malt products must be sold and stored non-cooled, non-chilled, and non-iced; (b) no

alcohol may be sold on Sunday; (c) clerks must be 19 years of age to sell alcohol; and (d) on-premises consumption is forbidden.  (*Id.* ¶ 6).

23. Indiana imposes a 25% cap on the amount of revenue convenience stores (and grocery stores) may raise from the sale of alcohol.  (Imus Test. at 402; Poindexter Test. at 123-24; Ind. Code § 7.1-1-3-18.5 (b)).  However, Indiana imposes no restriction on the amount of floor space a convenience store can dedicate to the display or sale of beer.  (Ricker Dep. at 64-65; Cobb Dep. at 92; Imus Dep. at 63).

24. Currently, there are about 2,800 convenience/grocery/drug stores in Indiana that have beer dealer permits.  Approximately 4,600 more beer dealer permits are currently available.  (Thickstun Test. at 348).

## D.   Dealer Permits/Liquor Dealers

25. Package liquor stores sell cold beer for take-away pursuant to a "dealer permit" that allows these stores to sell beer, wine, and liquor for locations in incorporated areas.  (Thickstun Decl. ¶ 10).

26. A package liquor store that sells take-away beer operates under the following conditions: (a) all alcohol may be served cooled, iced, or chilled or non-cooled, non-iced, or non-chilled; (b) state licensing is required for individuals to sell alcohol; (c) specialized server training is required for individuals to sell alcohol; (d) clerks must be 21 years of age to sell alcohol; (e) anyone under the age of 21 is not allowed to enter the premises; (f) alcohol may not be sold on Sunday; (g) on-premises consumption is not allowed; (h) a limited type of non-alcoholic

commodity may be sold; and (i) alcohol may not be sold outside the building.
(*Id.*).

27. There is a maximum quota on the number of dealer permits issued by the State.
(*Id.*).  Consequently, the cost associated with obtaining a package liquor store
permit is far higher than a permit for a convenience store.  (Poindexter Test. at
103).  In this manner, the State limits the sale of cold beer.  (*Id.* at 101-04).

28. Package liquor stores differ from convenience stores in several ways.  For
example, they are not legally allowed to sell many of the goods that convenience
stores sell; they cannot be open on Sundays; persons under the age of 21 may not
enter; and employees who sell beer must be 21 years of age or older, must be
permitted by the ATC, and must have successfully completed server training.
(Defendant's Stipulations of Fact ¶¶ 5, 10, 15-18, 23; Noe Dep. at 39-40; Imus
Dep. at 58).

**E.  Beer Retailer Permits/Beer Retailers**

29. A beer retailer permit is the permit that allows a business, like a restaurant or
tavern, to sell beer for on-premises consumption.  (Thickstun Test. at 331-32;
Poindexter Test. at 111; Ind. Code § 7.1-3-4-1) (providing that the "commission
may issue a beer retailer's permit to a person who desires to sell beer to customers
for consumption on the licensed premises and who meets the qualifications
provided by this title").

30. There are seven types of retailer permits: (a) a permit type to sell beer only for locations in incorporated areas; (2) permit type to sell beer only for locations in unincorporated areas; (3) a permit type to sell beer and wine for locations in incorporated areas; (d) a permit type to sell beer and wine for locations in unincorporated areas; (e) a permit type to sell beer, wine, and liquor for locations in unincorporated areas; (f) a permit type to sell beer, wine and liquor for locations in incorporated areas that allows for take-away; and (g) a permit type to sell beer, wine and liquor for locations in incorporated areas that does not allow for take-away.  (Thickstun Decl. ¶ 11).

31. All beer retailer permits operate with the following conditions: (a) all alcohol may be served cooled, iced, or chilled or non-cooled, non-iced, or non-chilled; (b) the facility must provide food for sale and have a minimum of 25 seats; (c) state licensing is required for individuals to sell alcohol; (d) specialized server training is required for individuals to sell alcohol; (e) if the premises contains a bar, it must be properly sectioned off from the family dining area; (f) anyone under the age of 21 is not allowed in the bar area; (g) waiters must be 19 years of age to sell alcohol in the family area of a restaurant and 21 years of age to work in the barroom or act as a bartender; (h) on-premises consumption is allowed; (i) restaurants which sell beer, wine, and liquor in unincorporated areas must meet an average food sales quota of $100,000 annually over the three years immediately preceding its application for a permit (a lower amount is required if the restaurant operates for six months or less per year).  The maximum quota of the number of these permits

is designated by the Indiana Code and the quota varies according to type of license.  (*Id.* ¶ 12).

32. Persons under the age of 21 may not legally enter the area of a restaurant or tavern where cold beer is sold for take-out.  (Poindexter Dep. at 171-72).  For restaurants and taverns that sell cold beer for take-away, there is no self-service option (*i.e.*, taking the alcohol from the shelf).  (Imus Dep. at 63).

## F.    Cold Beer and its Enforcement

33. American consumers prefer cold beer over non-chilled beer. (Imus Test. at 420). Indeed, the Indiana Excise Police seize and destroy cold beer more often than any other alcoholic beverage.  In addition, the majority of these cases involve minor possession of cold beer.  (Poindexter Test. at 90, 119-20; Thickstun Test. at 353, 384 (Q: "In your experience as an excise officer, when you're making arrests, seizures, things like that, and the product is beer, is the beer cold?"  A: "More often than not, yes.").

34. The primary outlet for the sale/purchase of cold beer is the package liquor store. (Imus Test. at 432; Noe Test. at 279-81).

35. In his 12-year career, Corporal Thickstun has made many more cases involving violations of Indiana's alcohol laws in convenience/grocery stores than he has in package liquor stores.  (Thickstun Test. at 353).  Further, comparing cases made at convenience stores with cases made at package liquor stores, the product that is

most often purchased (or attempted to be purchased) at a convenience store is beer. (*Id*. at 353, 384).

36. Plaintiffs submitted a document based on data from the ATC's website, prepared by Mr. Imus. (Plaintiffs' Ex. 117). Since 2005, the total violations noted by the ATC involved restaurants and bars at 73%; liquor stores came in second at 13%; and grocery stores, convenience stores, and drug stores came in third at 6%. (*Id*.). The remaining 9% were lumped under the category "other." (*Id*.). In the "Selling to Minors" category, restaurants and bars were cited 60% of the time; liquor stores came in second at 20%; and grocery stores, convenience stores, and drug stores came in third at 16%. (*Id*.).

37. Plaintiffs also submitted testimony regarding Indiana's alcohol compliance program, also called the Survey for Alcohol Compliance. (Poindexter Dep. at 138-49). The program involves the State excise police sending in minors to permit holders of all types to test whether the permittee will sell to the minor. (*Id*. at 138). According to Corporal Thickstun, the youths who participate must be and look under 21, are forbidden to carry any identification, and are forbidden from lying about their date of birth. (Thickstun Test. at 342). The point of the program is to determine whether the permittee asks for identification. (*Id*. at 343). Major Poindexter testified that the results of the survey reflect that grocery stores perform better than package liquor stores and restaurants and taverns. (Poindexter Test. at 61-62, 64).

## G.  Effect of Change in the Law

38. The convenience-store Plaintiffs would like to enter the "cold beer" market.  (*See, e.g.,* Imus Test. at 434; Cobb Test. at 201, 204; Ricker Test. at 226, 233-34; Thornton Test. at 157-58).  As it stands now, Indiana Code Section 7.1-5-10-11 precludes them from doing so.

39. Imus testified that, if the convenience-store Plaintiffs are allowed to offer, display, and sell beer that has been cooled by them, 70%-80% of the 1,500 stores that IPCA represents will immediately sell cold beer.  (Imus Test. at 417-18).  These businesses, as holders of beer dealer permits, would not be subject to the same restrictions as those placed on package liquor stores, restaurants, taverns, and the like.  (*Id*. at 417-19, 435-37, 439-40; Imus Dep. at 126-29).

40. A change in the law would result in more cold beer sold in the state.  (Imus Test. at 435-37, 440; Ricker Test. at 226, 236).  On this point Thornton testified that, if allowed to sell beer, his stores that currently sell beer will immediately sell cold beer, his stores will sell more beer than they currently do, his stores that do not currently sell beer will become permitted to do so, and he intends to add 10-15 more stores in Indianapolis and 8-10 more stores in Lake County.  (Thornton Test. at 167-68, 171-72).

41. Beyond this, if successful, many other stores that have beer dealer permits will be allowed to immediately sell cold beer, such as CVS, Walgreens, Walmart, K-Mart, Target, Marsh, Speedway, and Kroger.  (Thickstun Test. at 346).

42. There are 60 Indiana State Excise Police Officers performing law enforcement duties in the state who receive extensive training at the law enforcement academy and on-the-job training, including basic investigative techniques. (*Id*. at 349; Poindexter Test. at 81-82).

43. With so few trained excise police, the State will be challenged in terms of the enforcement of the alcohol laws. For example, since it is illegal for a minor to enter a package liquor store, if a young-looking person exits such a store with a package, an officer likely has reasonable suspicion to stop the person and inquire further. By contrast, since it is not illegal for a person under the age of 21 to enter a convenience or grocery store, if a young-looking person exits that establishment with a parcel, an officer likely does not have reasonable suspicion to stop the individual and inquire further. (Thickstun Test. at 350-51).

## II. CONCLUSIONS OF LAW

1. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2. The court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331, 2201, and 1367.

**A.    Standard of Review**

3. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

4. A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248.

5. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence

in the record in the light most favorable to the non-moving party and resolve all

factual disputes in favor of the non-moving party. *See Anderson,* 477 U.S. at 255.

**B.     Plaintiffs' Claims**

1. In their Second Amended Complaint, Plaintiffs allege that Indiana Code § 7.1-5-10-
   11: (1) violates their rights to due process of law under the Fourteenth Amendment
   of the United States Constitution and Article 1, Section 21 of the Indiana
   Constitution (Count IV); (2) violates their right to equal protection under the
   Fourteenth Amendment of the United States Constitution (Count I);  (3) violates the
   equal privileges and immunities clause under Article IV, § 2 (Count III – Plaintiff
   Noe only); (4) violates the commerce clause under Article 1, § 8 of the United
   States Constitution (Count II); (5) violates the privileges and immunities clause
   under Article 1, Section 23 of the Indiana Constitution (Count V); and (6) violates
   the liberty clause under Article 1, § 1 of the Indiana Constitution (Count VI).

2. In their proposed Findings of Fact and Conclusions of Law, Plaintiffs notified the
   court they were withdrawing their Commerce Clause claims alleged in Count II
   based on standing.  In addition, Plaintiffs did not respond to the State's argument
   that Noe's right to equal protection of the law alleged in Count III has not been
   violated, as he is treated the same as any other Indiana resident as it relates to the
   purchase of beer (warm or cold).  The State's motion for summary judgment on
   Counts II and III is therefore **GRANTED**.

3. Plaintiffs' federal constitutional claims are brought under 42 U.S.C. § 1983. That section provides a private cause of action against a person, who acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983).

4. To prevail on a Section 1983 claim, a plaintiff must show that he or she suffered the violation of a federal constitutional right, which was clearly established, by one acting under color of state law. *Id.*

5. Before addressing the merits of Plaintiffs' claims, the court first addresses two threshold issues: (1) whether Noe has standing to challenge Indiana's alcoholic beverage laws, and (2) whether the State is entitled to Eleventh Amendment immunity from Plaintiffs' state law claims.

**C.      Standing/Plaintiff Noe**

6. Article III, § 2, of the Constitution limits the "judicial power" of the United States to the resolution of "cases" and "controversies." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). One aspect of the case-or-controversy requirement is standing. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) (citing *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 663–664 (1993)); *O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005).

7. Standing turns on whether the plaintiffs have a personal stake in the controversy and "whether the dispute touches upon the 'legal relations of the parties having adverse legal interests.'" *O'Sullivan*, 396 F.3d at 853 (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)).  To have standing, a plaintiff must demonstrate: (1) an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; that is, the injury has to be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted).

8. Noe is named as a plaintiff in Counts I, IV and V of Plaintiffs' Second Amended Complaint. Counts I and V allege a violation of convenience stores' purported equal protection right to sell cold beer, and Count IV asserts a violation of convenience stores' due process rights because the word "cooled" is allegedly vague.  Noe, however, is an individual who has never owned or operated a convenience store in Indiana and has never sought any permit to sell alcohol – and has no intent of doing either in the future.

9. Noe, therefore, lacks standing to litigate Counts I, IV, and V.

**D.     Eleventh Amendment Immunity**

10. In *Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89 (1984), the Supreme Court held that the Eleventh Amendment barred official capacity suits against state officers in federal court for the violation of state law. *Id.* at 106. The Court reasoned, "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh amendment." *Id.*

11. However, a state's sovereign immunity is not absolute. This rule has two exceptions: a state may waive its sovereign immunity and consent to suit in federal court, "or Congress may use its enforcement powers under the fourteenth amendment to abrogate the states' eleventh amendment immunity." *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir. 1993). "For either exception to apply, the intent to waive or abrogate immunity must be explicit and unequivocal." *Id.* (citing *Kroll v. Bd. of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991), *cert. denied*, 502 U.S. 941 (1991)).

12. Plaintiffs contend the State waived its sovereign immunity through its participation in this case, and by its litigation conduct – *i.e.*, its failure to pursue the defense until the filing of its response to the present motion for preliminary injunction and the filing of its own motion for summary judgment, both of which were filed on February 7, 2014.

13. In support of their argument, Plaintiffs rely on *Lapides v. Bd. of Regents*, 535 U.S. 613 (2002). In that case, the Supreme Court held that Georgia's voluntary removal

of a case instituted by a professor in the Georgia state university system constituted a waiver of its Eleventh Amendment immunity. *Id*. at 620.  In its holding, the Court relied on prior case law which held that a state's voluntary appearance in federal court amounted to a waiver of its sovereign immunity.  *Id*. at 619.  Thus, although Georgia was brought involuntarily into the case as a defendant in the original state-court proceedings, Georgia voluntarily agreed to remove the case to federal court, thereby invoking federal court jurisdiction.  *Id*. at 620.  The Court reasoned: "It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand."  *Id*. at 619.

14. Plaintiffs also rely on *Ku v. State of Tennessee*, 322 F.3d 431 (6th Cir. 2003), a case in which the Sixth Circuit, relying in part on *Lapides*, held that the State of Tennessee waived its sovereign immunity through its litigation conduct.  *Id*. at 435.  Although Tennessee was initially brought into the case involuntarily, Tennessee engaged in extensive discovery, moved for summary judgment on the merits, and failed to assert the defense of Eleventh Amendment immunity until the district court decided the case on the merits.  *Id*. at 435.  "[W]e hold that appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction is a form of voluntary invocation of the federal

court's jurisdiction that is sufficient to waive a State's defense of Eleventh Amendment immunity." *Id.*

15. Like the governmental entities in *Lapides* and *Ku*, the State (i.e., Huskey in his official capacity) was brought involuntarily into this case. However, the State did not remove the case to federal court; the case was initiated here by the Plaintiffs.

16. In addition, unlike the governmental defendants in *Lapides* and *Ku*, the State has consistently raised its defense of Eleventh Amendment immunity throughout this litigation. The State asserted the Eleventh Amendment as an affirmative defense in its Answer to Plaintiffs' Complaint, First Amended Complaint, and Second Amended Complaint. The State also opposed Plaintiffs' Motion for Leave to File a Second Amended Complaint and included in that opposition argument that the Eleventh Amendment and *Pennhurst* barred Plaintiffs' state-law claims.

17. That the State responded to discovery, participated in court conferences with the Magistrate Judge, responded to the present motion for preliminary injunction, and filed a motion for summary judgment on the merits is not the type of litigation conduct sufficient to waive the State's defense. Plaintiffs' reliance on those facts fails to recognize that the State had a duty to litigate the federal constitutional claims asserted against it. Further, in the State's motion for summary judgment, the first issue raised in the State's Argument Section addressed its entitlement to Eleventh Amendment immunity; the State's arguments on the merits of Plaintiffs' state law constitutional claims were made in the alternative.

18. The court therefore finds, under the particular circumstances of this case, the State did not waive its Eleventh Amendment immunity. Plaintiffs' state constitutional claims asserted against the State are therefore barred. *See Pennhurst*, 465 U.S. at 919 (holding that "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment"). The State's motion for summary judgment on Plaintiffs' state law claims asserted in Counts V and VI is **GRANTED**.

**E.    Plaintiffs' Federal Constitutional Claims**

**1.    Due Process/Void for Vagueness**

19. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

20. The void-for-vagueness doctrine requires that a statute that prescribes a penalty be written "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citation omitted).

21. In 1941, the Indiana Supreme Court held that the "cooled beer" provision is written with sufficient definiteness that ordinary people can understand the type of conduct that is prohibited. *Doyle v. Clark*, 41 N.E.2d 949, 951 (Ind. 1941) ("We are of the opinion that the phrase 'iced or cooled by such permit holder before or at the time of

such sale' etc. is not indefinite and there need be no uncertainty as to what is prohibited.").

22. Even if *Doyle* were not dispositive on the issue of notice, Plaintiffs would face a tough hurdle. To prevail on their facial challenge, Plaintiff "must demonstrate that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id*. at 495; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010) ("[T]he dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means the plaintiffs' vagueness challenge must fail."). *But see United States v. Jones*, 689 F.3d 696, 704 (7th Cir. 2012) ("The doctrine surrounding the 'facial' and 'as applied' forms of judicial review is 'currently a subject of hot debate, both in the Supreme Court and among commentators.").

23. Plaintiffs cannot show that the challenged provision is unconstitutional as applied to them. Plaintiffs display, offer, and sell many items that have been cooled by them, such as soda, milk, eggs, and wine. (*See, e.g.,* Thornton Test. at 156-58). To sell "cooled" beer would merely require them to place the beer that is now on the shelves of their respective stores in the refrigerator. (*Id*. at 157-58; Ricker Test. at 223-24, 227, 230, 233-34; Imus Test. at 417, 431-32). That Plaintiffs know what is prohibited is demonstrated not only by their admissions, but also by the fact that there have been few citations issued for violations of this provision. Indeed, Ricker

and Freedom have never been cited for violating this provision, and Thornton's citation was because it put a malt product in a refrigeration unit, thinking it was wine.

24. Still, Plaintiffs maintain that the challenged provision fails to give a precise standard on the meaning of "cooled," thereby giving the State Excise Police no standards to prohibit arbitrary enforcement. *See Gresham v. Peterson*, 225 F.3d 899, 908 (7th Cir. 2000) ("A statute that 'vests virtually complete discretion in the hands of the police' fails to provide the minimal guidelines required for due process." (quoting *Kolender*, 461 U.S. at 358)).

25. As an initial matter, the Constitution has "a greater tolerance for enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates*, 455 U.S. at 498-99. Here, the challenged provision results in only civil penalties.

26. The challenged provision prohibits the permittee from offering, displaying, or selling beer that has been iced or cooled by the permittee at or before the time of sale. Contrary to Plaintiffs' suggestion, the use of these words connotes not only an intentional act, but also an act that is designed to accomplish a specific goal – the sale of cold beer. As the Supreme Court noted in *Hoffman Estates*, "[T]he alternative 'marketed for use' is transparently clear: it describes a retailer's intentional display and marketing of merchandise. . . . The standard requires scienter, since a retailer could scarcely 'market' items 'for' a particular use without intending that use." 455 U.S. at 502.

27. The prohibition on the sale of beer that has been iced or cooled by the permittee is so obvious that the excise police have found few violations of it. Since 2007, there have only been a handful of violations, and most of those involved the permittee placing a product that it did not think was beer into a cooler. Given that officers are trained in investigations, and given the multiple levels of appeal that a permittee can invoke, the enforcement of this provision is not standardless or vague. (*See* Thickstun Test. at 366-68) (testifying about the citation process, the right to an administrative hearing, and the right to seek judicial review).

28. The court therefore finds that Indiana Code § 7.1-5-10-11 is not unconstitutionally vague as a matter of law facially or as-applied. The State's motion for summary judgment on Plaintiffs' due process claim (Count IV) is therefore **GRANTED**.

## 2. Equal Protection

29. The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall . . . deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const., Art. IV, § 1. "All equal protection claims, regardless of the size of the disadvantaged class, are based on the principal that, under 'like circumstances and conditions,' people must be treated alike, unless there is a rational reason for treating them differently." *LaBella Winnetka, Inc. v. Vill. Of Winnetka*, 628 F.3d 937, 941 (7th Cir. 2010) (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601-02 (2008)). For economic legislation, like the challenged provision here, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the

classification drawn by the statute is rationally related to a legitimate government interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted).

30. The State has a legitimate interest in limiting the sale of alcohol and, more to the point, a legitimate interest in curbing the sale of immediately consumable beer to minors. *See* Ind. Code § 7.1-1-1-1.

31. Plaintiffs mount a number of arguments in support of their contention that the Indiana alcoholic beverage laws violate their rights to equal protection of the law. The court will begin with their argument that Indiana's "cooled beer" provision discriminates between those that are located in incorporated towns, and those that are located in unincorporated towns. According to Plaintiffs, "this disparate treatment defies common sense."

### a.   Incorporated vs. Unincorporated Grocery Stores, Convenience Stores and Drug Stores

32. Grocery stores or drug stores located in incorporated towns may not sell cooled beer. *See generally*, Ind. Code § 7.1-5-10-11. Plaintiffs' equal protection challenge rests on the argument that grocery stores (whose statutory definition includes convenience stores) and drug stores located in unincorporated towns are not subject to that prohibition. *See* Ind. Code §§ 7.1-3-4-3, -4.

33. Plaintiffs' argument relies on several different statutory provisions dealing with beer retailer's permits. The first of these provides:

The commission **shall not issue** a beer retailer's permit, **except as otherwise authorized in this title** and subject to the other restrictions contained in this title, to the following persons:

(13)   **A person who is not the proprietor of a restaurant** located and being operated on the premises described in the application for the beer retailer's permit, or of a hotel, or of a club, owning, or leasing the premises as a part of it.

Ind. Code § 7.1-3-4-2(13) (emphasis added).

34. The second provides:

The commission may issue a **beer retailer's permit** as authorized by IC 7.1-3-4-3, only to an applicant who is the proprietor or a drug store, grocery store, confectionery, or of a store in good repute which, in the judgment of the commission, deals in other merchandise that is not incompatible with the sale of beer.

Ind. Code § 7.1-3-4-4.

35. Plaintiffs argue that the phrase "except as otherwise authorized in this title" in Indiana Code § 7.1-3-4-2(13), read in conjunction with Indiana Code § 7.1-3-4-4, means that grocery stores and drug stores may sell cooled beer if they are located in unincorporated towns. In other words, even though the former statutory provision precludes a grocery store or drug store from selling cooled beer pursuant to a beer retailer's permit, the latter trumps it. The State responds that a proper interpretation of the statutory provisions leads to the conclusion that Indiana disqualifies a grocery store or drug store from receiving a beer retailer's permit unless it is a restaurant, hotel, or club. Thus, in order for these businesses to sell cooled beer in unincorporated towns, they must comply with all of Title 7.1's requirements that apply to a beer retailer's permit, including, for example, a restaurant on the premises

that has 25 seats intended for customers to consume food on the premises, the restaurant must have a certain amount of food sales annually, and its servers must go through server training. (Thickstun Test. at 335-36). Moreover, to sell carry out cooled beer from a restaurant in an unincorporated town, in addition to the restrictions noted above, the beer must be purchased from a bartender who is permitted by the State (i.e., no self-service), and the purchaser must be over 21 years old to enter the bar area. (*Id*. at 335-338; Poindexter Test. at 113-14).

36. "In Indiana, the lodestar of statutory interpretation is legislative intent, and the plain language of the statute is the 'best evidence of . . . [that] intent." *Estate of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009) (citing *Cubel v. Cubel*, 876 N.E.2d 1117, 1120 (Ind. 2007)). The court examines the statute as a whole, with the understanding that the statute should be "applied in a logical manner consistent with the statute's underlying policy and goals." *Cubel*, 876 N.E.2d at 1120.

37. Having considered the plain language of the statutory provisions at issue and its underlying policy and goals, the court finds the Plaintiffs' interpretation of Indiana Code § 7.1-3-4-4 is at odds with Title 7.1's statutory scheme. The court can think of no reason why the legislature would disqualify grocery stores and drug stores from a beer retailer's permit pursuant to § 7.1-3-4-2(13), and qualify them to have a beer retailer's permit just two sections later.

38. Major Poindexter testified that, in his 27 years with the State, he is unaware of a single instance of a convenience store, grocery store, or drug store (in an unincorporated area) obtaining a beer retailer permit to legally sell cooled beer.

27

(Poindexter Test. at 116-17). Corporal Thickstun's experience is the same. (Thickstun Test. at 333-34). In addition, Mr. Imus from the IPCA admitted he could not identify one convenience store, grocery store, or drug store that was able to sell cooled beer in unincorporated areas by virtue of a beer retailer permit. (Imus Test. at 429). In sum, for Plaintiffs to obtain a beer retailer's permit, they would have to completely change their business model to conform to the requirements of Title 7.1.

39. "The equal protection clause requires similar treatment of similarly situated persons; it does not require things which are different in fact or opinion to be treated in law as the same." *Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011). While the similarly situated analysis is not a precise formula, demonstrating that one is similarly situated to another group is "essential to the success" of an equal protection claim and the groups must be "very similar indeed." *Id*. (quoting *LaBella Winnetka, Inc. v. Vill. Of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010)).

40. The court finds that Indiana's "cooled beer" provision, which restricts a business with a beer dealer permit from offering, displaying, and selling beer that has been cooled by it, applies uniformly to Plaintiffs' business model – convenience stores, grocery stores, and drug stores that operate pursuant to beer dealer permits. As Indiana treats all businesses that hold a beer dealer's permit the same, whether in an incorporated or unincorporated town, Plaintiffs' equal protection claim based on the treatment of grocery stores and drug stores in incorporated versus unincorporated towns must be dismissed.

### b. Rational Basis

41. Plaintiffs also argue that this "arcane statute" has no rational basis.

42. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Federal Commc'n Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Rational basis review does not authorize "'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam)). Therefore, a statutory classification is accorded "a strong presumption of validity." *Beach Commc'ns, Inc.*, 508 U.S. at 314-15. The court must uphold the challenged provision "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. The "'burden is on the one attacking the [classification] to negative every conceivable basis which might support it.'" *Heller*, 509 U.S. at 320-21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

43. Plaintiffs argue that Indiana's statutory scheme is irrational because: (1) minors are exposed to beer – including cold beer – in all kinds of settings, including festivals, amusement parks and countless events at the State Fairgrounds; and (2) the current state of the law "forces" grocery stores, convenience stores, and drug stores to put

the beer products out in the open on floors or shelves, making it more visible and accessible to minors, than if it were in a cooler.

44. The issue in this case is whether limiting the sale of immediately consumable cold beer to certain types of businesses – and placing additional restrictions on those businesses – is rational. Thus, whether minors are exposed to cold beer at social events or exposed to "room temperature" beer on convenience-store shelves, is irrelevant.

45. Plaintiffs also argue that Indiana's statutory scheme is irrational because package liquor stores and restaurants, who may sell cold beer, have a compliance[3] rate with Indiana's alcohol laws that is below that of grocery stores, convenience stores, and drug stores. (*See* Findings of Fact ## 36-37).

46. Plaintiffs' reliance on these statistics is misplaced. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

---

[3] Plaintiffs' reference to package liquor stores'/restaurants'/taverns'compliance rate as compared to the compliance rate of grocery/convenience/drug stores is problematic. All of the statistics were gathered under the current statutory and regulatory framework, where grocery/convenience/drug stores cannot sell cold beer. It is pure speculation, then, to conclude that these statistics will remain the same if other businesses are allowed to sell cold beer. (*See, e.g.*, Thornton Test. at 163 (testifying that Thornton has not been cited for selling beer to minors in Indiana; however, Thornton's has been cited for selling beer to minors in other states where cold beer is allowed to be sold); Dabulis Test. at 256-57; Thickstun Test. at 343-44 (testifying that a permittee passes the alcohol compliance program merely by asking the minor for identification, and fails to account for the myriad of cases involving a minor's use of fake identification).

Such judicial restraint is necessary "to preserve to the legislative branch its rightful independence and its ability to function," and has "added force where the legislature must necessarily engage in a process of line-drawing." *Id.* (internal quotation marks and citations omitted).

47. The State could have rationally believed that limiting the sale of immediately consumable cold beer to package liquor stores furthers its legitimate goal of curbing underage consumption of alcohol. The court's finding is supported in the record.

48. As noted several times before, package liquor stores are subject to much stricter regulations than grocery/convenience/drug stores. It costs far more for a package liquor store to enter the market than it does a grocery/convenience/drug store; consequently, there are far fewer package liquor stores in the State than grocery/convenience/drug stores. This naturally results in fewer outlets in the State to purchase cold beer.

49. Restaurants and taverns are also subject to stricter regulations than grocery/convenience/drug stores.

50. Corporal Thickstun testified that many more cases are made for violations of Indiana's alcoholic beverage laws when the product involved is cold beer. The majority of those cases involve minors. (Thickstun Test. at 353).

51. Were the law otherwise and grocery/convenience/drug stores were permitted to sell cold beer, the evidence suggests that many more outlets for the sale of cold beer will be constructed, and Indiana's alcoholic beverage laws will be tougher to enforce.

52. Restricting the sale of cold beer to certain types of businesses and restricting the sale of cold beer only to businesses that have more restrictions placed on them is a classic example of legislative line-drawing. Indiana's legislative classifications, which serve to limit the outlets for immediately consumable cold beer, is rationally related to the legitimate goals of Indiana's alcoholic beverage laws; opening this market to others without restriction is not.

53. In sum, the State drew a line between package liquor stores, beer retailers, and beer dealers, such as grocery stores, convenience stores, and drug stores. Plaintiffs essentially argue that the line was drawn incorrectly. "[L]egislation 'does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1072 (7th Cir. 2013) (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

54. The State has advanced a plausible reason for the classifications in Indiana's alcoholic beverage statute. *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end."). The State's motion for summary judgment on Plaintiffs' equal protection claim (Count I) is therefore **GRANTED**.

## F.    Preliminary Injunction

55. Plaintiffs request the court preliminarily enjoin the enforcement of Indiana Code § 7.1-5-10-11.

56. A preliminary injunction is analyzed "in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).

57. Under the threshold phase for preliminary injunctive relief, a plaintiff must establish – and has the ultimate burden of proving by a preponderance of the evidence – each of the following elements: (1) that it has a reasonable likelihood of success on the merits of the underlying claim; (2) that it will suffer irreparable harm in the interim period prior to final resolution of its claim if the preliminary injunction is denied; and (3) that traditional legal remedies would be inadequate. *Id*. at 1086.

58. "If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction." *Id*. (citation omitted).

59. Here, Plaintiffs have failed to establish a reasonable likelihood of success on the merits of their federal and state claims. Accordingly, Plaintiffs' motion for preliminary injunction is **DENIED**.

### III. Conclusion

The State's Motion for Summary Judgment (Filing No. 77) is **GRANTED**, and the Plaintiffs' Motion for Preliminary Injunction (Filing No. 44) is **DENIED**.

**SO ORDERED** this 16th day of June 2014.

RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.